OPINION OF THE COURT
Beverly S. Cohen, J.
In this CPLR article 78 proceeding, the petitioner, a medical doctor, challenges on constitutional grounds a determination of the New York State Department of Social Services (the Department) dated November 26, 1996 (the Determination). The Determination imposed a fine of $102,000 and suspended the doctor from participating in the New York State Medicaid Provider Program (Medicaid). This action was taken without a hearing. Petitioner also asks for injunctive relief barring the Department from suspending her from participation prior to the hearing, or staying her exclusion from Medicaid. Petitioner also argues that the Determination is arbitrary and capricious and the penalty imposed is so disproportionate to the offense as to shock the conscience.
The Department opposes the petition on the grounds that the doctor has failed to exhaust administrative remedies and that the regulations pursuant to which the doctor was suspended have been approved by the courts. The petition is granted in part and denied in part for the reasons that follow. The motion for injunctive relief is granted.
Petitioner is a pediatrician practicing in a clinic in the In-wood section of upper Manhattan, where there is a shortage of doctors. Her patient population is comprised of poor children and their adult parents and caretakers, 100% of whom are insured by Medicaid. Petitioner’s husband operates a pharmacy across the street from the clinic.
*13 On November 9, 1995, the Department issued a notice of proposed agency action stating that petitioner had engaged in unacceptable practices as defined in 18 NYCRR 515.2. Specifically, petitioner was charged with providing and submitting claims for medical services and prescriptions that were false, not medically necessary, and not supported by adequate records documenting their necessity.
Petitioner was given an opportunity to refute the charges in writing, and did so on December 20, 1995.
On November 26, 1996, the Department issued the Determination. Petitioner’s contract with Medicaid was terminated and she was excluded from Medicaid for three years effective on December 19, 1996. The effective date of her exclusion was extended until December 25, 1996. The Determination advised petitioner that she could request a special administrative hearing.
Petitioner requested a hearing by letter dated December 5, 1996. On the return date of the petition herein, January 16, 1997, this court granted a temporary restraining order staying respondent from excluding petitioner from Medicaid pending determination of this petition. On January 21,1997, petitioner’s name was published by respondent on a list of providers excluded from Medicaid. Her name was subsequently removed from the list on a date that does not appear in the record.
The hearing originally was scheduled for March 6, 1997, but the parties advised the court that it was adjourned to April 29, 1997, four months after the effective date of petitioner’s suspension. The reason for the adjournment was that one of the Department’s witnesses was unavailable. Petitioner agreed to the adjournment because of the stay granted by this court. The parties have advised the court that two more adjournments were granted. The second adjournment was granted to May 15, 1997 because petitioner was ill. On May 15, 1997, one day of testimony was taken. The hearing was then adjourned for three months until August 14, 1997.
After the date of submission, the court gave the parties an opportunity to submit additional information. The court requested that the parties advise the court in writing of the reason for the adjournment of the hearing. The court also asked the parties by letter to specify what rules and regulations supported petitioner’s contentions concerning the consequences of exclusion from Medicaid.
The exclusion of a doctor from the Medicaid program for misconduct produces grave professional consequences. The *14 Federal Government requires that all State Medicaid programs contain a provision that the State will provide information and access respecting sanctions taken against doctors by Medicaid to the State licensing authority, any peer review organizations, any private accreditation entity, and to the agencies administering Federal health care programs. (42 USC § 1396r-2 [a] [1], [2]; 42 CFR 455.17.) When Medicaid initiates the exclusion of a doctor, it is required to notify other State agencies, the State medical licensing board, the public, beneficiaries, and everyone entitled to notice of an exclusion from Medicaid pursuant to 42 CFR 1001.2005 and 1001.2006. (42 CFR 1002.212.) An exclusion from Medicaid requires reporting of the facts and circumstances of the exclusion to the appropriate State or local agencies responsible for licensing and certification of doctors (42 CFR 1001.2005), and notice of the exclusion "as appropriate” to:
"(1) Any entity in which the excluded individual * * * is known to be serving as an employee, administrator, operator, or in which the individual or entity is serving in any other capacity and is receiving payment for providing services * * *
"(2) State Medicaid Fraud Control Units;
"(3) Utilization and Quality Control Peer Review Organizations;
"(4) Hospitals, skilled nursing facilities, home health agencies and health maintenance organizations;
"(5) Medical societies and other professional organizations;
"(6) Contractors, health care prepayment plans, private insurance companies and other affected agencies and organizations;
"(7) The State and Area Agencies on Aging established under title III of the Older Americans Act; and
"(8) Other Departmental operating divisions, Federal agencies, and other agencies or organizations, as appropriate.” (42 CFR 1001.2006.)
Exclusion from Medicaid is a ground for which proceedings may be commenced to exclude the doctor from Medicare. (42 USC § 1320a-7 [b] [5]; 42 CFR 1001.601.)
The petitioner has submitted evidence demonstrating that the MetLife Empire Plan automatically terminates contracts with physicians who have been excluded by Medicaid.
Once a doctor is excluded from Medicaid a hospital cannot be reimbursed by Medicaid for any services or medicines ordered by the excluded doctor, with the exception of a 30-day *15 period in which the doctor may continue to treat patients admitted prior to the exclusion. (18 NYCRR 515.5.)
If a hospital takes any action affecting for more than 30 days a doctor’s clinical privileges at a hospital, the hospital is required by Federal statute to report it to the State board responsible for licensing physicians (42 USC § 11133 [a]) and to the United States Secretary of Health and Human Services (42 USC § 11134 [b]). This sort of data is required to be reported not less than monthly and is stored and disseminated (42 USC § 11134). Every hospital is required to check the data for each physician who applies to be part of its medical staff or for admitting privileges. (42 USC § 11135 [a] [1].) Hospitals must also check the data relating to their staff members and doctors with admitting privileges once every two years. (42 USC § 11135 [a] [2].) There is a presumption that hospitals have knowledge of the information concerning physicians reported to the Secretary, whether or not the hospital obtains it. (42 USC § 11135 [b].)
A final administrative determination to exclude a doctor from Medicaid, when no appeal is pending, constitutes professional misconduct. (Education Law § 6530 [9] [c].) Once a final administrative appeal is decided adversely to the doctor, the Office of Professional Misconduct imposes a penalty after a hearing in which the doctor is not permitted to present evidence on any issue except the penalty to be imposed. (Public Health Law § 230 [10] [p].) Although petitioner argues that the Determination could result in an automatic penalty by the Office of Professional Misconduct, that would only happen after the final hearing is held before the Department.
The threshold issue to be determined is whether petitioner cannot maintain this proceeding because she has not exhausted her administrative remedies. Respondent’s position is that an article 78 proceeding is premature because the hearing presently scheduled is the final step in the administrative process.
However, the exhaustion of remedies rule does not apply to petitioner’s due process claim. There is no requirement of exhaustion of remedies where an agency’s action is challenged as unconstitutional, as it is here. (Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 57.)
The exhaustion of remedies rule does apply to petitioner’s challenge to the Determination on the grounds that it is arbitrary and capricious and that the penalty is disproportionate to the offense. Therefore, the court will not rule on those issues.
*16 Turning to the constitutional issue raised, petitioner alleges that the hearings are not conducted day to day until conclusion, that a backlog at the Department frequently causes the hearings to take months or even a year, and that a written decision usually is issued months after the conclusion of the hearing. Respondent denies these allegations in its answer, but no other evidence is submitted to rebut petitioner’s allegations regarding the wait for a hearing and decision. In the course of this case, since the Determination in December of 1996 until August of 1997, only one day of testimony will have been taken.
Petitioner’s allegations concerning the wait for a hearing are unrebutted and must be accepted as true. An article 78 proceeding is in the nature of a motion for summary judgment. (People v D.B.M. Intl. Photo Corp., 135 AD2d 353.) Uncontradicted factual allegations are deemed admitted (Costello Assocs. v Standard Metals Corp., 99 AD2d 227, 229), proof must be submitted in evidentiary form (Zuckerman v City of New York, 49 NY2d 557), and conclusory assertions are insufficient to oppose the entry of judgment (Jeffcoat v Andrade, 205 AD2d 374, 375).
The Medicaid regulations (18 NYCRR 519.1 et seq.) do not provide a time limit in which a requested hearing must take place. The regulations provide that the sanctioned medical provider must receive notice of a final determination and that there is a right to a hearing (18 NYCRR 519.5). The request for a hearing must be made within 60 days of the Department’s determination (18 NYCRR 519.7). The Department must give at least 15 days’ written notice of the hearing date (18 NYCRR 519.10). The Department must issue a decision within 120 days of the conclusion of the hearing (18 NYCRR 519.22). The regulations are silent on the length of the permissible interval between the notice of final determination and the hearing date. There is no requirement for the hearing to be conducted in a reasonably continuous manner.
Fourteenth Amendment § 1 to the United States Constitution commands that no State shall "deprive any person of life, liberty, or property, without due process of law”. New York State Constitution, article I, § 6 provides that "[n]o person shall be deprived of life, liberty or property without due process of law.”
The Due Process Clause permits a prehearing suspension to protect important public interests, provided that a hearing is held " 'at a meaningful time and in a meaningful manner.’ ” (Barry v Barchi, 443 US 55, 66.) The Constitution requires that *17 the hearing proceed and be concluded without appreciable delay. (Barry v Barchi, supra, at 56.) The courts of this State also require a hearing in a meaningful time. A three-month delay in scheduling a hearing for a Waterfront Commission employee suspended without pay has been ruled to be a violation of due process. (Matter of Pelaez v Waterfront Commn., 77 AD2d 947.)
The Medicaid regulations on their face do not provide a time limit in which a requested hearing must take place. As applied here, the regulations have permitted a delay of four months from the suspension by Medicaid for holding the hearing and will permit another four-month delay after the conclusion of the hearing for a final decision to issue. In addition, lengthy adjournments have occurred between scheduled days of testimony. Therefore, petitioner’s prehearing suspension would trigger due process, if petitioner has a protected liberty or property interest.
The courts have consistently rejected the claim that a Medicaid provider has a property interest in continuing to participate in Medicaid because the contracts with the physicians are terminable without cause pursuant to 18 NYCRR 504.7. (Schaubman v Blum, 49 NY2d 375; Matter of Polanco v Commissioner of Dept. of Social Servs. of State of N. Y., 212 AD2d 443; Senape v Constantino, 936 F2d 687 [2d Cir 1991].)
The liberty interest protected by the Constitution from deprivation without procedural safeguards includes the freedom from allegedly false determinations disseminated by the Government that impose a stigma and interfere with the ability to find gainful employment: "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure.” (Truax v Raich, 239 US 33, 41.)
One has a right, founded on the concept of liberty, to attempt to clear one’s name at a hearing when the State imposes a stigma that forecloses freedom to take advantage of future employment opportunities. (Board of Regents v Roth, 408 US 564, 573-574.)
The Supreme Court found a protected liberty interest in a government security clearance, without which an aeronautic engineer employed by a private defense contractor could not find work at a comparable salary. (Greene v McElroy, 360 US 474.)
*18 A qualified attorney must be given a hearing before he is deprived of the right to practice law on the ground that he lacks character and fitness. (Willner v Committee on Character, 373 US 96.)
There is a liberty interest in one’s good reputation, honor and integrity. The United States Supreme Court prohibited the State of Wisconsin from, without a hearing, placing in liquor stores a poster prohibiting the sale of alcohol to a pictured woman stating that she was a danger to herself, her family, or the public because of her excessive drinking. (Wisconsin v Constantineau, 400 US 433.) In Wisconsin, the Court held that: "Where a person’s good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.” (Supra, at 437.)
Five years later, the United States Supreme Court, in Paul v Davis (424 US 693), imposed an additional loss that had to be shown to trigger the right to due process. In Paul, the plaintiff had been arrested for shoplifting, but the charges were dismissed. The local police had distributed his mug shot, along with others, to local retailers under the caption "Active Shoplifters”. The majority opinion, written by Justice Rehnquist, interpreted the language "what the government is doing to him,” in Wisconsin v Constantineau (400 US, supra, at 437), to mean: "the fact that the governmental action taken in that case deprived the individual of a right previously held under state law — the right to purchase or obtain liquor in common with the rest of the citizenry.” (Paul v Davis, supra, at 708 [emphasis added].) It was held that: " 'Posting,’ therefore, significantly altered her status as a matter of state law, and it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards.” (Supra, at 708-709.) Justice Rehnquist found that Mr. Davis had not lost any right under State law, but had only been defamed. His due process claim was rejected.
The additional requirement necessary to trigger due process became known as the "stigma plus” test. (Brandt v Board of Coop. Educ. Servs., 820 F2d 41 [2d Cir 1987]; Neu v Corcoran, 869 F2d 662, 667 [2d Cir 1989], cert denied 493 US 816; Valmonte v Bane, 18 F3d 992, 999 [2d Cir 1994].) In Brandt v Board of Coop. Educ. Servs. (820 F2d 41 [2d Cir 1987]), it was held that there was a "stigma plus” where a public school teacher had a negative letter placed in his personnel file upon being *19 dismissed from his job. The court reasoned that potential employers would gain access to the file and damage the teacher’s future job opportunities.
In Valmonte (supra) the Second Circuit Court of Appeals held that a computer bank of suspected child abusers created a stigma plus because child care employers were mandated by law to consult the data bank before hiring anyone and because the employer had to place a written reason for hiring anyone on the list in that person’s personnel file. The "plus” in Valmonte was the additional burden on the employer of giving a reason for hiring the individual.
The Court of Appeals in 1996, following Valmonte (supra) in reviewing the same statutory scheme, held that a psychologist reported as a child abuser had a protected liberty interest where his name was placed in a data bank of child abusers. (Matter of Lee TT. v Dowling, 87 NY2d 699.) The Court’s reasoning was that the listing had "severely jeopardized future employment prospects in his chosen field.” (Supra, at 709.)
The courts of this State have stated many times in dictum that there would be a liberty interest requiring due process protection where there is public dissemination of allegedly false stigmatizing reasons for loss of professional opportunities. (Matter of Lentlie v Egan, 61 NY2d 874; Matter of Bezar v New York State Dept. of Social Servs., 151 AD2d 44, 50 [there would be a liberty interest if there were public dissemination of stigmatizing reason for denial of participation in the Medicaid program].) The Appellate Division, First Department, has stated in dictum that a medical provider threatened with suspension or sanctions for misconduct, as petitioner here is, is entitled to an evidentiary hearing because notice of exclusion from Medicaid for misconduct must be published pursuant to 42 CFR former 1002.206 (c). (Matter of Ray Pharmacy v Perales, 169 AD2d 633 [holding that provider terminated without cause was not entitled to a hearing, but distinguishing cases where a provider is terminated for cause]; accord, Matter of Khawaja v Kaladjian, 207 AD2d 398 [2d Dept 1994]; Matter of Bezar v New York State Dept. of Social Servs., 151 AD2d 44 [3d Dept 1989], supra; Matter of Bora v New York State Dept. of Social Servs., 152 AD2d 10 [3d Dept 1989]; see generally, Matter of Paul v New York City Hous. Auth., 234 AD2d 51 [1st Dept 1996] [name-clearing hearing for demoted public employee not required because there was no public dissemination of false stigmatizing reason for demotion].)
However, in a Second Circuit case involving a physician removed from the Medicaid program for cause the Second *20 Circuit rejected the argument that the doctor had shown a "plus”. In Senape v Constantino (1995 WL 29502, 8 [SD NY, Jan. 26, 1995, Sotomayor, J.], affd 99 F3d 401), it was held that the doctor did not have a protected liberty interest requiring a hearing before exclusion because "[w]hile [his] opportunities for employment * * * may be hindered by his exclusion from [Medicaid], he has not been dismissed from a government job to which he had an entitlement, and he still retains his license to practice medicine.” Although there was dissemination of stigmatizing information because the New York State Department of Social Services "fulfilled its obligations under law by notifying the state licensing board and other groups that plaintiff was excluded from participation in the Medicaid Program”, the list on which the doctor’s name was included did not explain the reason for the termination. (Supra.) The court, distinguishing Valmonte (supra), noted that the Department did not specifically target the plaintiff’s potential employers to receive the list and that the list neither forbids a facility from hiring excluded doctors, nor places a burden on employers who hire them. An earlier Second Circuit case had stated that there might be a liberty interest where a doctor in the Medicaid program is terminated for cause. (See, Kelly Kare, Ltd. v O’Rourke, 930 F2d 170, cert denied 502 US 907 [holding that termination of provider without cause did not infringe a protected liberty interest].)
The court declines to follow the holding in Senape (1995 WL 29502, supra) because the petitioner in this case obviously has lost far more than the right to purchase a bottle of liquor. Plaintiff retains her license to practice medicine, but is doubtful that she will be able to work as a physician, so long as she is excluded from Medicaid for misconduct, because of the effect of the exclusion on hospital affiliation and insurance company reimbursement. Her practice is solely devoted to Medicaid patients. In this day and age, the ability to practice medicine is inextricably entwined with the availability of insurance. The vast majority of patients cannot afford medical care unless the doctor is a Medicaid or Medicare provider, or belongs to an insurance or managed care plan.
The loss of hospital privileges that will surely result from petitioner’s exclusion will be reported on a national data bank and must be obtained by any hospital that wishes to employ her or to grant her admitting privileges. Her exclusion must be reported to anyone known to employ her, hospitals, managed care plans, nursing homes, insurance companies, and *21 prepaid health plans; in short: to all of her potential employers.
It ignores reality to focus on the doctor’s retention of a medical license, when, in fact, virtually all professional opportunities will be foreclosed and petitioner’s clinics will be put out of business. The statutes and regulations that require reporting to the data bank and impute knowledge of the information stored there to hospitals are a public dissemination and, in this case, dissemination took place, although it was revoked at an unspecified time.
The report of petitioner’s exclusion from Medicaid is no less damaging than the placement of a negative letter in a teacher’s personnel file, which was found to be a "plus” in Brandt v Board of Coop. Educ. Servs. (820 F2d 41, supra). The requirement that hospitals must check the data bank before hiring any physician, on pain of being presumed to know its contents, is an additional burden placed on the employment of a doctor, or a "plus”, just as the requirement of writing a justification for hiring a suspected child abuser was in Matter of Lee TT. (supra) and Valmonte (supra). A hospital that hires a reported doctor could be held liable for malpractice.
This court is not required to follow Senape (1995 WL 29502, supra). "[A] State court is not bound under the doctrine of stare decisis by the opinions of the Federal courts.” (Fields v Board of Higher Educ., 94 AD2d 202, 207, affd 63 NY2d 817; Maro Leather Co. v Aerolineas Argentinas, 161 Misc 2d 920, appeal dismissed 85 NY2d 837, cert denied 514 US 1108.)
In interpreting the New York State Constitution, the courts of this State are not bound by interpretations of parallel language in the Federal Constitution. (People v Scott, 79 NY2d 474, 496 [interpreting the warrant requirement in the State Constitution more broadly than the United States Supreme Court’s interpretation of the Fourth Amendment to the Federal Constitution]; accord, People v Alvarez, 70 NY2d 375, 378.) The presence of parallel language in the State Constitution " 'signifies its special meaning to the People of New York; thus, the failure to perform an independent analysis under the State Constitution would improperly relegate many of its provisions to redundancy’ ”. (People v Scott, supra, at 496.) An independent construction of the State Constitution "is particularly appropriate where a sharp or sudden change in direction by the United States Supreme Court dramatically narrows fundamental constitutional rights that our citizens have long assumed to be part of their birthright”. (Supra, at 497.)
*22 Due process is not a static concept, but a flexible one that evolves to protect our conception of the fundamental fairness that must be given to every citizen. Due process: " 'is not a technical conception with a fixed content * * *’ (Anti-Facist Committee v McGrath, 341 US 123 * * *). It embraces fundamental rights and immutable principles of justice (People v Terra, 303 NY 332, 334) and use of the term is but another way of saying that every person’s right to life, liberty and property is to be accorded the shield of inherent and fundamental principles of justice (see Ives v South Buffalo Ry. Co., 201 NY 271, 293, 295-296; see, also, People v Yamin, 45 Misc 2d 407, 417). Due process of law guarantees respect for personal immunities 'so rooted in the traditions and conscience of our people as to be ranked as fundamental’ (Snyder v Massachusetts, 291 US 97, 105 [Cardozo, J.]). It imposes upon courts the duty to foster ' "that fundamental fairness essential to the very concept of justice” ’ (People v Leyra, 302 NY 353, 364).” (People v Isaacson, 44 NY2d 511, 520.)
In determining whether the New York State Constitution affords greater rights than the Federal Constitution, the courts may use noninterpretive analysis, proceeding from judicial perception of sound policy, justice and fundamental fairness. (People v Isaacson, supra) Noninterpretive analysis attempts to discover State statutory or common-law history and traditions of the State in its protection of the individual right, any identification of the right as being of peculiar State or local concern, and any distinctive attitudes of the State citizenry concerning the scope or definition of the right. (People v P. J. Video, 68 NY2d 296, 303.)
Our courts have always been protective of the right of our citizens to pursue their occupations. The courts of this State have always mandated a hearing before a license needed to pursue one’s livelihood is revoked. (See, e.g., Matter of Hecht v Monaghan, 307 NY 461; Honey Dippers Septic Tank Servs. v Landi, 198 AD2d 402; Matter of Jackson v Wallach, 48 AD2d 925; Matter of Wrona v Donovan, 88 AD2d 998.)
The decisional law of our State recognizes that due process requires a hearing where there is dissemination of stigmatizing charges for loss of employment or demotion, such as drunkenness or physical abuse. (Matter of Jackson v Wallach, 48 AD2d 925, supra [probationary hospital attendant entitled to a hearing because of stigmatizing reason for dismissal]; Matter of Petix v Connelie, 47 NY2d 457 [demotion for possible trafficking in stolen property would have entitled police offi *23 cers to name-clearing hearing if it had not been said in the newspaper article disseminated that the officers were cleared of all charges]; Matter of Paul v New York City Hous. Auth., 234 AD2d 51, supra.) The courts of this State have also recognized the need for a name-clearing hearing where stigmatizing information is disseminated and affects professional opportunities. (Matter of Lee TT. v Dowling, 87 NY2d 699, supra; Matter of Lentlie v Egan, 61 NY2d 874, supra; Matter of Bezar v New York State Dept. of Social Servs., 151 AD2d 44, supra; Matter of Ray Pharmacy v Perales, 169 AD2d 633, supra; Matter of Khawaja v Kaladjian, 207 AD2d 398, supra; Matter of Bora v New York State Dept. of Social Servs., 152 AD2d 10, supra.)
In addition, there is no question that in this State the unfairness of the timing of a hearing where loss of one’s means of support is at stake can amount to a due process violation. (Matter of Lee TT. v Dowling, supra, at 712 [dissemination of report of child abuse prior to hearing and determination is a violation of due process]; Matter of Jones v Berman, 37 NY2d 42, 55-56 [immediate hearing required on denial of application for emergency relief under Aid to Families with Dependent Children Program, 60-day wait for a fair hearing was a denial of due process]; Matter of Pelaez v Waterfront Commn., 77 AD2d 947, supra [more than three-month suspension from work without pay pending hearing and determination violates due process].)
The process that is due depends on three distinct factors: the private interest that will be affected; the risk of an erroneous deprivation through the procedures used, and the government’s interest; including fiscal and administrative burdens of additional or substitute procedures. (Mathews v Eldridge, 424 US 319, 334-335.) Moreover, once a suspension has been imposed, the interest of the person suspended in a speedy determination becomes paramount, whereas the State has little or no interest in delay. (Barry v Barchi, 443 US 55, 67, supra.) A postsuspension hearing should be prompt and concluded without appreciable delay. (Supra.)
In cases where loss of means of support is implicated, the expense and inconvenience of the government is outweighed by the urgent need for a hearing at a meaningful time and in a meaningful manner. (Matter of Jones v Berman, 37 NY2d 42, 56, supra.) Where a reputational injury is at stake, the Court of Appeals has held that the hearing must be granted at a time when the deprivation can still be prevented because unlike deprivation of property, which can be remedied by *24 monetary damages, injuries to one’s reputation cannot be so easily overcome and may be irreversible. (Matter of Lee TT. v Dowling, supra, at 713.)
The doctor’s livelihood and the continuation of a medical practice that she has built up over many years are imperiled by a prehearing suspension. The dissemination of her suspension for cause during the protracted hearing process sullies her reputation. There is little or no justification for the torpid administrative process that is afforded. The Department’s regulations mandate a hearing and there is no justification for holding it in such a prolonged manner. The regulations here are especially egregious because once the Department imposes a prehearing suspension, it has, in effect, obtained a judgment in its favor and no longer has a motive to expedite the hearing.
The principle at issue here is not whether the petitioner should ultimately be excluded from Medicaid if the charges against her are sustained. The issue is whether she should suffer the loss of her profession, her practice and her reputation for a lengthy and indefinite period of time without the opportunity for a hearing. It is the view of this court that the Due Process Clause was designed to prevent exactly this sort of injustice.
The regulations of the New York State Department of Social Services regarding the prehearing suspension of Medicaid providers terminated for cause (18 NYCRR 519.1 et seq.) are unconstitutional under the Due Process Clause of the New York State Constitution, on their face and as applied here, because they do not provide a time limit within which the hearing must commence and do not mandate that the hearing be conducted in a reasonably continuous manner.
Accordingly it is ordered, adjudged and decreed that the due process claim in the petition is granted, the motion for a permanent injunction is granted, and the remainder of the claim regarding the penalty is denied with leave to renew after the exhaustion of administrative remedies; and it is further ordered that the respondent, the New York State Department of Social Services, its agents, and its employees are enjoined from excluding petitioner from participation in the New York State Medicaid Provider Program pending the determination of the hearing scheduled on the notice of action under the medical assistance program dated November 26, 1996; and it is further ordered that the respondent, the New York State *25 Department of Social Services, its agents, and its employees are directed to hold the said hearing on consecutive days until completed.